My name is Tom Cowell. I am counsel for the plaintiff's assembly and I would like to commence today. I am not going to spend a lot of time because this court has heard this argument before. I want to address the trust responsibility issue, which is particularly the one that this court asked us to address. I am going to rely on my associate Jim Kovic to address the sovereign immunity issue. With regard to the trust responsibility, we claim that the housing regulations here are so pervasive that they do constitute the justification for applying the trust responsibility as set forth by the United States Supreme Court in Mitchell 2. By the way, if I may point attention to the fact that I did ask, I handed out today a list of cases. There's nothing but just a citation of cases that will save me from having to go through it and I just won't have that. Yes, has Judge Gould been faxed a copy of that? That's okay. I don't need it really. I'll follow it. Don't worry. We'll make sure that one is faxed to you following the argument. Okay. They might fax me a sheet with the citation. Oh, okay. Yeah, I don't have. Why don't we do that? Judge Gould, is it all right if that waits until after the oral argument? Yes, certainly. Yeah, I can follow it without the numbers. I may on occasion refer to a number. I will. I will. Okay. Thank you. Thank you. Thank you. We claim that the housing regulations are so pervasive that they do justify the application of the Mitchell Doctrine and we think that's because the regulations address every aspect of construction and occupancy. They address virtually everything that happens with regard to these houses. There's no contract that exists without HUD's approval. And I don't think I need to argue that because this panel has already concluded that. This panel then went on to say, however, that Mitchell II applies only to regulations of tribally owned resources. And there we do disagree. We think that there is no such limitation in Mitchell II. In fact, the direct language that is cited, that is referred to, is from Mitchell II, statutes and regulations, and I quote, give federal government full responsibility to manage Indian resources and land. There is an addition of the word land, and we shouldn't ignore that word. Very important. In fact, that has been picked up by this court, the Ninth Circuit, in Inter-Tribal Council v. Babbitt. That is the first case I listed on my list of cases. I mean, Inter-Tribal Council v. Babbitt. And the word land is very significant in this case because, as Judge Fregerson has already very well pointed out, these houses that we're talking about were constructed on trust land. Therefore, we already have a trust corpus in the sense of the houses that were being constructed on trust land. It's your argument that regardless of the relationship that follows the construction of the housing, that the mere fact that it is constructed on trust land means that the trust responsibility attaches? That's one little teeny part of my argument, yes. That is true. I do believe that the fact that there is trust land is significant. It's positive all by itself. No, I'm not arguing that. I think the fact, though, that you might consider if we are stuck with the word resources, and I don't, and I'm going to say it in a minute, I don't think we are, but if we're stuck with resources, I think that the houses and the land that they sit on is a resource of the tribe, of the Indians, and that is significant, and yes, it would qualify. But I don't think we should limit it to that. That kind of implies a natural resource limitation, and I don't think the trust responsibility is in any way limited to natural resource matters. Correct. Thank you. Judge Ferguson, I'm having trouble hearing your comments. I don't know how your mic is set up. All right. How's that? That's perfect. Okay. I'm going to push the mic away in case I say something I regret later on. But we have this statement in the statute of the acronym of HOSDA that passed a number of years after these houses were built, that the Congress, here's the statement, the Congress, through treaty, statute, and the general course of dealing with Indian tribes, has assumed a trust responsibility for the protection and preservation of Indian tribes and for working with tribes and their members to improve their housing conditions and socioeconomic status so that they are able to take a greater responsibility for their own economic conditions. Moreover, providing affordable homes in safe and healthy environments is an essential element of the special role of the United States in helping tribes and their members to improve their housing conditions and socioeconomic status. So that's a statement in the legislation that, of course, is not dependent upon whether this is a trust land or not. I agree. I think that's a statement of policy, a statement of position, that I think accurately reflects what this country's role is as it relates to this trust responsibility. And I think that's very important as I get into my last point in this argument about how it's an enhancement of existing statutes, what I want to call this court's attention to today. Just very briefly, and I don't want to dwell much on this, the history of the trust responsibility starting out with the Cherokee Nation, which is on my list, where the United States Supreme Court says the relation of Indians to the U.S. resembles that of a ward to a guardian. The Seminole Nation versus United States, 1942 case, in which the court referred to the distinctive obligation of trust incumbent upon the government in dealing with these sometimes exploited people. Government is something, and I'm still quoting, government is something more than a mere contract with the party. That's very significant in our case. Quoting again, it has charged itself, that's the government, with moral obligations of the highest responsibility and trust as it relates to Indians. That's the United States Supreme Court speaking in 1942. Following up with Montana v. Blackfeet tribe in 1985, United States Supreme Court case, and I quote, the standard principles of statutory construction do not have their usual force in cases involving Indian law. And quoting again, statutes are to be construed liberally in favor of the Indians with ambiguous provisions interpreted to their benefit. That, I think, is very important. That gives us an idea of how we treat Indian matters in this country. And for that reason, I think it's wrong to limit this trust responsibility to natural resources or even to just resources. And clearly, I think the law doesn't support that. The tribal property was referred to in Lincoln v. Vigil, that's the United States Supreme Court case, I think that's number five on my list, in 1993. And the Court of Claims has gone on beyond that, way beyond land and resources. Case number six on my list, Navajo tribe v. United States, cited with approval in Mitchell II, 1980 case. The control or supervision over tribal money or property is what they refer to. And I think that's at least beyond land and resources. Fiduciary relationships normally exist with respect to these monies and properties. In the seventh case I cited, Pyramid Lake Haute tribe v. Morton, applies it to water rights. I think we're all familiar with the Cobell case. I cited that in number nine. That's one of the two reported cases. And that's an IIM account. Then the White Mountain Apache, more recent Supreme Court case, deals with buildings. We're certainly dealing with more, I think, than land and resources. And even this court itself, the Ninth Circuit, in the native village of Vanete, IRA council v. Alaska, they say that the statute, in that case it says, the statutes are to be construed liberally for Indians. Canons of construction applicable to Indian law are based on trust relationships. And then number 12 on my list, Marlis Bear Medicine v. United States, another Ninth Circuit case. Because of the fiduciary duty, the BIA had a duty to ensure basic safety practices were communicated and used at a logging site. This, I think, is a further indication that the trust responsibility isn't limited to resources. And that I respectfully request that you reconsider that limitation. But beyond that, and maybe even more significant, that I want to call your attention to today, and I, what I call my associate now is really the Bible in federal Indian law, Felix Cohen. Felix Cohen does speak to this question. And he refers to the language in Mitchell II, resources and land. But then he goes on, and he adds another aspect. And I refer to page 437 of his 2005 book, the edition of the 2005 Felix Cohen book on federal Indian law. The trust responsibility is much broader than managing resources and land. Trust responsibility extrapolates additional federal duties from otherwise general statutory requirements. I want to follow up on that. I want to cite perhaps the most important case that I've cited on my list, and that's case number 13, the Blue Legs case. 867 said 2nd, 1094. In that case, an Eighth Circuit case, the BIA and the Indian Health Service were said to have not merely violated the federal law, that's the Resource Conservation and Recovery Act, but in doing so they have violated their fiduciary obligation towards the plaintiffs and the tribe. In effect, they're saying the statute is buttressed by the existence of the trust responsibility. In other words, the mandate of the statute becomes even more important than the trust responsibility. In that case, we had a statute that required the cleanup of garbage. Very interesting. Somewhat similar to what we've got. Unsanitary, unfenced, uncovered garbage dumps caused infectious disease, caused problems. Children were getting at it, and when it rained and flooded, it spread all over. It was a very serious problem. The Eighth Circuit said that you can't rely on the fact, and this is what the BIA and the IHS said, we only contract with somebody else. That's their problem. That's not our problem. We only contract with a private contractor. They are in charge of taking care of the dumps. Don't look at us. And the Eighth Circuit said no, this is on an Indian reservation. Indian matters are involved, and because of the fiduciary responsibility, the duties, the contract is not an excuse, and they held both the BIA and the IHS responsible for cleaning it up. I maintain that's exactly what we've got here. We have a federal statute, a congressional act, that says we must provide safe, decent, and sanitary housing. In our contention, that is not precatory. It's mandatory. That needs to be done. There is all kinds of language in the statute on the housing statutes that require that to be done, and we maintain that just like in the housing dump case, there is a requirement, because of the fiduciary responsibility, to go one step further and hold them liable under their fiduciary capacity to make sure they follow the law. That's what we're saying. One other case, Pike v. Califano. It's case number 14 on my list, another Eighth Circuit case. In that case, Congress has passed a general mandate to provide necessary health care for Indians, very similar to what we've got with housing, health care. And that case raised a very interesting question. Somebody on the reservation was committed involuntarily, and the state came around and said, Hey, it's in our institution, but it's not our responsibility. You, the federal government, should pay for it. And, of course, the BIA said, No, we don't have any provision for doing that. And the Eighth Circuit said, You must pay, because of the fiduciary responsibility, the trust responsibility added to the requirement of the health law generally to provide adequate health care on the reservation for Indian folks. That in itself was sufficient to require them to pay. I suggest the same thing applies with us. We have a housing law that says provide safe, sanitary, and decent housing. And we think they should be required to do it. If they don't, there's a fiduciary obligation. Counsel, I have some questions about the argument concerning sovereign immunity and exhaustion. Are you the person who will be able to respond to that, or is that your co-counsel? No, try me. Okay. I was wondering what your response is to the thought that the housing authority has waived the argument that the tribal court should have an opportunity now to decide on the meaning of the sue or be sued clause in view of the statement in the straight case that this is a prudential and not a jurisdictional doctrine. Because it wasn't brought up until the petition for rehearing. It was not brought up in the earlier iteration of the case. Right. And I'm not sure that I can address that very question. I think very strongly that we have shown the HUD has waived its sovereign immunity. That's not quite your question. That's not my question. That's not your question. Your question is what about the deference to the tribal court? Should they be given an opportunity to decide? Right. That's the question I'm asking about and whether that argument has been waived. I really don't think it makes any sense to go to the tribal court at this point when the dispute is between HUD and the Indian National Guard. I don't see how that could add anything to it. And, no, I don't think that that's appropriate. And, yes, I do think it's waived. One more case I wanted to draw attention to is the Northern Cheyenne tribe v. Lujan. And that case came as a result of this court, the Ninth Circuit's court decision in the Northern Cheyenne tribe v. Podell. It's actually the same case I cited as case number 16 on my list. As a result of that, it was remanded. And Judge Batten in the federal district court in Billings said, when you take into consideration the trust responsibility, it requires strict adherence when the Indians are affected. And for that reason, again, it's enhancing existing law. Very quickly, I want to say something about the ATA, the Administrative Procedures Act. I do believe— I want to ask you one question. It's extremely well-perceived. You've gone there. You've seen them. Yes. I don't—I'm trying to visualize. The only picture I could find in the records was this paper article, but I can't tell from that how these foundations were built. They were wood. Wood, what? I mean, you can have like a concrete block and then wooden plate, you know, some stuff, and then they have a vertical post that's wood, and then you build your floor. A lot of buildings have done that. Was that done this way? A little bit more sophisticated than that, as I recall. It is. They are side-by-side. I mean, they're stacked one on top of another, big beams, wooden beams that are treated with the toxic material. So instead of pouring concrete, they're just stacked over it? That's correct. Why is that more sophisticated? It's more sophisticated than what you were saying. Okay. It's just opposed with wood across it. They actually stack one fairly large beam on top of another. Is that right? But you see, this was even in their basement. The one I saw was in their basement. All the basements were just like anybody else's basements. They had basements that far, you know, on the windows, a little bit of a window towards the top floor. That was my recollection. One other thing I could say, just very briefly, just to give you an illustration of what really was impressive to me was Lucky Edwards. Lucky Edwards, when he was showing us through his house, he was telling how they finally got someone to come in and inspect the house. They got some experts to really find out what kind of mold they had, what was going on. And he was telling us how he showed them into the living room. He said, now, the kids are downstairs in their room in the basement, and then Debbie's down there. Let's go down there. Here's the basement. Here's the kids' room. Here's the closet. And they looked over in the closet, saw the mold, and they high-tailed it out of there and went up and put on their moon suits. Now, that basement was a little different. That was a different configuration, but it was still underneath the ground about halfway. On the APA, I did want to say this. I do think that this court is wrong. Again, this panel is wrong in saying that plaintiffs have no remedy apart from the legal damage. Just a second. But in particular, I wanted to say there that if you read the complaint, and I call your attention to count two of the amended complaint, yes, we have spot damages in other counts, but in that count we are limiting our request to a simple matter of fixing it. We're saying follow the law. The law says to provide decent, safe, sanitary housing. We want that done. We aren't asking for any damages. We're not asking for a substitute or failing to do it or a breach of it. We're just simply saying that is our request. Fix it. That's all we're asking. Fix it. And that is exactly consistent with the Bowen case, and the Bowen case was where the state tried to get a claim. A state tried to get a claim. You're not asking for any. You're not. On count two. So you are only taking damage to the person. On the other count. That's what the state is. Yes, yes, yes. But on count two, and that's our APA claim, we're not. We're asking for that count or simply fix it. And that I think is supported by the Dukakis case, which is the last one on my list. That's an Arizona district court case which said exactly the same thing. The housing authority there was an instrument of HUD. They have a right to sue HUD under the APA. They were entitled to ask that it be fixed. Thank you very much. Good afternoon, Your Honor. Please report. My name is John Harrison. I'm a tribal attorney with the Confederated Salish and Kootenai Tribes. We're an amicus. I'm here today with the tribe's managing attorney, Ronald McDonald, and on the brief was Daniel J. Decker, another tribal attorney. Your Honors, thank you for allowing us time to address the court. We're here today as a friend of the court to raise the things we see as significant consequences for any country in the Gulf of India. A very important issue here with the dismissal of HUD is the potential that the tribal federal trust relationship gets inverted where the beneficiaries to a treaty-based trust obligation, in this case housing, the beneficiaries themselves become, through the unilateral acts of the United States, become responsible for the delivery of a treaty-based trust obligation for the potential ultimate liability. What is the specific rule of law that you propose that we should adopt? If you could write one paragraph that would be the whole thing that you think properly describes how we know whether there's a trust relationship in specific relation to this housing. In this case with regard to housing, this is what makes the case very tough. If HUD built these houses, it would clearly be a Mitchell II situation where they comprehensively managed and developed and built the house, the trust aspect. In this case, they passed it through a tribal organization. They acquired a tribal organization to be set up, and they passed the money through there. In this case, we would say Mitchell II should apply. In this case, the situation, these facts are closer to the White Mountain Apache case. It's been court-decided in 2003. These facts are closer to that because you have the pervasive, comprehensive regulation of the delivery of a tribal trust asset. Well, what's the asset, and how do we know when regulation is comprehensive? I mean, that's a generalization, but how do we know it when we see it? And what is the asset that you're talking about? The asset is the house. Treaty-based obligation of the federal government to build and provide houses for tribal members. The asset is the house. If HUD had built it, I think it would be a very simple case, a very simple Mitchell case. HUD had the regulations. They said, here is how houses will be built. We will build them for you based upon the treaty obligation. Here they are. And in this case, the design and the materials resulted in the failure of the delivery of the trust asset to do this essentially because they're, according to plaintiffs, allegedly unlivable. In this case, you have the same situation. Statutory obligation based upon treaty. Basic, comprehensive regulation regarding the structure and design and materials to be used in housing. And the houses ended up being built, but they were built with the pass-through of the HUD. I'm just trying to understand your position. If there had been no specifics about how to build the houses, if it had simply said, please go build houses, here's the money to do that, but had said nothing about size, configuration, materials, methods, and so forth, what would be your position? I think, Your Honor, that would be a Mitchell I case. You have the fair general trust obligation. If you look at the Navajo coal case, the White Mountain Apache, you heard the same day it was issued. The White Mountain Apache case in 2003, the Supreme Court said Mitchell II trust obligation. Navajo coal case, they said there was no Mitchell trust obligation because under the Indian Mineral Leasing Act, tribes were allowed to either have the BIA negotiate their mineral royalties or they could, through the Indian Mineral Leasing Act, do it themselves. And the United States has a ministerial token presence in signing off as a trustee. The Supreme Court said under the Navajo coal case, that's a Mitchell I general trust obligation. The United States has a trust obligation to oversee what would happen ultimately by signing off, but the tribes themselves were free to go negotiate their deals, hire their own experts, hire their attorneys. They were free to do that by themselves. That was similar to Mitchell I, the General Allotment Act, which said to hold the land in trust with tribal members while you get your feet on the ground and figure out what you want to do with it. Maybe I'll leave that to the Navajos here to discuss. It was a better deal than they had. They thought they were getting it. Yes, they did. The general deal was about 12 percent. As I understand it, it was a federal rate at the time, but there was an opinion that came out later that they should be entitled to 20 percent. Yes, I know. Under that act, they were free to do it themselves. The difference is, and I guess to answer Judge Graber's question, under this act, there are ostensibly self-determination issues. You're free to go, here's the money, go build your own house. If they had done that, as Judge Graber had just given as an example, that might be a Mitchell I situation. They were not allowed to do that. They were told, here's the money, here's the sheet of regulation, you shall create a housing entity, we shall give you the money, the housing entity shall have this following form document, this organic document. You shall build them to these specs. You shall use these materials. Essentially, there was no choice. It was unlike the Navajo cold case where they could have— The inspection, I might leave that to the U.S. or the Blackfeet attorney specific to that. As I understand from the case, the Blackfeet Housing Authority were the ones that built it. I don't know if anybody inspects anything, one of the U.S. or the Blackfeet might know more specifics with regard to that. I guess just generally what I was saying was, in this case, it is unlike the Navajo cold case where, for the general lawman act, the tribal members were left with their own options. There was a general trust responsibility, but they were essentially left on their own. In the example that Judge Graber gave, if they were just given the money and said, go build houses, here's the money you need to provide housing, they were not. They were given money with a pervasive, comprehensive, regulatory schedule. Does it make any difference that participation in the program to begin with was not mandatory? It may, Your Honor, but what I understand is that they didn't participate in the tribes' participation with the federal. As I understand it, the tribes were told, if you want housing, here's how you're going to get it. But that's the if. I guess what I'm saying is, as I understand it, a tribe was not expressly required by the legislation that it had to start taking the money and building the houses. Does that make any difference to the analysis? Because it's like a quid pro quo for the decision to participate, rather than an overarching control regardless of the desire to participate. I didn't express that very well. No, I understand what you're saying, Your Honor. I think I understand what you're saying. Secondly, I believe that there was a Ferguson special concurrence, which I understand very well, a treaty-based obligation of the federal government to provide housing. This is the method in which they chose to provide it. They said these housing statutes are the way in which you shall get your treaty-based promise of housing. You shall get it essentially the way we tell you, which is why this right is due. It's due to fiduciary obligations. Every action of providing of a treaty-based trust obligation, trust promise, was unilaterally decided by the federal government. They occupied the entire field. So whether this was a choice that they elected, this is not like a program they elected to deal with social services where there was an opportunity for federal funding, and they had a treaty-based right to have housing. The tribe I represent, the State of Chattanooga, the Treaty of Hell Gate, which is Stephen's Treaty, a treaty pervasive through the entire Northwest, specifically states that housing shall be provided by the federal government. The federal government said, we acknowledge in the housing force of dealing and treaty, the federal government has a trust obligation to provide housing. That trust obligation rises to a Mitchell II fiduciary obligation. When the United States fully occupies that field, they say, we are going to tell you, we are going to tell you how you're going to get that deal. Excuse me one second. In Judge Gould's chambers, there's some kind of noise right near the microphone. That's happening. I don't know if... I don't... I don't... Yeah, whatever that is. I don't know if you can control it, but it's loud here. Okay. I think we've got to stop. Thank you. I thought it was... Well, maybe I might... I'm running very low here. If this wasn't a situation where you had a treaty-based obligation that was comprehensively managed by every aspect, the delivery, the set-up, the requirement of the tribal entity to pass dollars through, the design, materials... regulatory role that the United States plays. I don't think this is a mistake to say it was a treaty-based obligation that the federal government just gave the money to the tribes and said, here's $125,000, but $125,000 is very unwilling to take that money. Is it fulfilling the treaty obligation? Respectfully, that would not be the way that most tribes would probably choose to have that fulfilled, or maybe some tribes in the area of self-determination would like to do it their own way. But in this case, you have it essentially where you're one foot in, one foot out. The federal government says, here, self-determination allows us to let you go build houses, we'll give you the money, we're going to regulate every single aspect of how that's done. So, essentially, they have it both ways. They're arguing this mutual want. They're free to do what they want. We have an overarching general trust obligation. We're arguing it as a result of the facts of this case, with regard to at least the housing laws. The pervasive, comprehensive regulatory schedule and scheme and structure that the federal government placed upon tribes essentially left them with no choice. Either have no housing, or do it the way we say. That is the meaning of Mission 2, as I believe the Supreme Court has said. The reverse of that is to say, we have a treaty-based trust obligation scheme, but you're going to fulfill that, and if the delivery of that treaty-based trust obligation fails, you are now liable. And we think that that's against the meaning of Mission 2, which is that when a government comprehensively regulates something to the detriment of the tribe, then... Yes, Your Honor. Thank you for allowing me to have the right to speak. Thank you. Good afternoon. My name is Patterson Joe, appearing on behalf of the Lehigh Naval Housing Authority. I would first like to thank the Court for the opportunity to appear before you today. We are here because we are in a very precarious position that the Court's opinion has placed us in. We, although we're not parties to the underlying litigation, we have an ordinance that is very similar, if not identical, to the ordinance that was observed by this Court. It's also, the ordinance that was ruled upon by this Court is also similar to a lot of other housing authorities across the country. Our first concern is the Court's conclusion that any judgment can be satisfied out of the housing authority on fees, revenues, and rents from the housing authority. That statement greatly expands the very limited and specifically defined exception from the housing authority's exemption from levies and execution. If you look at the Clause 7 of the ordinance, Article 7 of the Enabling Ordinance, the first sentence is a general prohibition against levies and execution. That protects the property and the funds of housing authorities. The second sentence of that same clause is a limited and specific exemption for obligees. The word obligee is specifically defined in the definition section of the Enabling Ordinance for the housing authority. The obligee is defined as a holder of an obligation, and an obligation is also defined in the definition section. An obligation is specifically defined as a note of debt, an interim certificate, or an indenture that is authorized by the housing authority. So clearly, the intent of the ordinance was that there would be a contractual agreement between the obligee and the housing authority for the housing authority to waive its exemption from levies and execution. That was a very limited exception to the protection placed on the housing authority's funds and property. But the way that the court has interpreted and applied it in this case greatly expands that limited exception and creates more opportunity for people to file more lawsuits against housing authorities, not only against the Blackfeet Housing and Animal Housing Authority, but other Indian housing authorities across the United States. We believe that that point alone merits reconsideration by this court. Another concern that we have is that there are other restrictions on the use of MHAZDA funds contained by the MHAZDA statutes and the regulations. If you look at the regulations that implement MHAZDA funds, specifically 24 CFR Part 1000.26 of Section 8, the regs mandate that OMB Circular A87 applies to the use of MHAZDA funds. OMB A87, there are five attachments. If you look at Attachment B, paragraph 16, there is a specific limitation to the use of MHAZDA funds to pay fines, penalties, damages, and settlements. Where there is an alleged violation of federal law, state law, local law, and even tribal law, the use of such funds to pay alleged violations are not allowable under OMB Circular A87. And if the housing authority uses its funds to pay any such alleged violations of law, there are consequences that are dire. If you look at 25 U.S.C. Section 4161, and in there, the statute requires, it's mandatory, that if there's a violation of any noncompliance with the regulations, then the Secretary, it says, shall terminate payments to the recipient or reduce their payments or reduce the availability of payments to recipients. So we believe that that merits consideration by this Court, that that is something that applies to all housing authorities, all recipients who receive funding from MHAZDA. And we believe that that should be included into consideration by this Court, that there are restrictions that apply to the use of MHAZDA funds and that these funds should not be available for any damages, penalties, or fines that are consistent with OMB Circular A87. In reading the decision, there's one other matter that I've come across related to the Court's decision and analysis regarding Section 16 and Section 17 corporations. And I've also reviewed the Court's reference to the Cohens Handbook, page 256. And there, it was stated that Indian housing authorities are Section 17 corporations, therefore they are acting in their corporate capacity. And the Court used that as a basis to conclude that the immunity of housing authorities have been waived. When I looked at page 256 of the Cohens Handbook, there is no citation or reference to an Indian housing authority as the party to any of the cases that have been cited. Is that a factual question, whether they are a Section 17 entity, or is that a question of law? Both. The whole question of whether an entity is either a Section 16 or 17 corporation, a tribal entity on its own does not have the unilateral authority to do that. That is a process that requires the involvement and the approval from the Indian housing authorities, which is a federal separate entity. In this particular case, I see nothing in the record that shows that the Blackfeet Housing or Blackfeet Housing Authority predecessor went through that process and received and obtained approval from the Bureau of Indian Affairs to be a Section 17 corporation. So we believe that the Court should review and reconsider its conclusion on that issue. The Navajo Nation is not organized under the Indian Reorganization Act of 1934, which set in place Section 16 and Section 17 corporations. So the Navajo Housing Authority is not a Section 17 corporation, nor is it a Section 16 corporation. I can see that my time is getting closer. If there are any other questions, I would be happy to answer them. Any questions? I have no questions. Thank you. Thank you. May it please the Court. My name is Steve Doherty. I represent Blackfeet Housing and the individually named private defendants within the Department of Jail. Members and representatives of the Blackfeet Tribes Legal Department as well as the staff and Board of Blackfeet Housing. I want to thank the amicus and the Court for the opportunity to come back and visit with you and get on what I believe to be the right path. I think we got off on the wrong foot at the last little argument. I would also point out that it was Blackfeet Housing that raised the issue, if not the appellant, of HUD's trust responsibility in our petition for rehearing. That's important because the decision, if it stands, would seem to prevent a potential cross-claim by Blackfeet Housing against HUD. In representing my client, that potential cross-claim against HUD is something that I think is very important. I think the decision has five major legal impacts and six practical effects. Is your client a Section 17? Pardon? Is your client a Section 17? Blackfeet Housing is not a Section 17 corporation. It has never applied to become a Section 17 corporation. There is nothing in the record that indicates it is a Section 17 corporation. In the absence of evidence, is that a factual determination that we should be making in the first instance, or is that a factual determination for a district court? In other words, the absence of information isn't the same as affirmative evidence in the record stating what you've just said to us. The record is not as clear as what you've just represented. The whole issue of Section 17 was first brought up by the plaintiffs in their response. I don't want to know about blame or when it came up. I just want to know if that's a factual determination that we are in a position to make one way or the other. It's up to the court. We can go back to the district court and make a determination that it is not a Section 17 corporation. And how does that affect the answer? How does that affect the answer to the conundrum that we face? I think the difference it makes is that the court went down the road in looking at coins and talking about the commercial activities. I represent a nonprofit, low-income governmental arm of the Blackfeet tribe that gets all of its funding under a formula from HUD. It is not a commercial activity. It is not a for-profit. We're not selling oil and gas. We're not selling timber. We're providing a governmental function. And under the Laneen B. Keeler River Indian Community case, when you look at the nature of the activity or the nature of what is going on, that's the key, not a formulaic decision about are you a Section 17 or not a Section 17. If we're not looking at 16 versus 17, are we looking at a landlord and a tenant? For Blackfeet housing? Right. Under the mutual help agreements, which you provided to the court as a supplement during the discussion in the last argument, it's not a landlord and a tenant. It's a mutual help and occupancy agreement in which the individual, if they pay up over a period of years, will eventually become homeowners. So it's not landlord and tenant. That's like my relationship to the bank. It can still be a commercial. You know, it's like my mortgage. Eventually, with God willing, I'll own my house. But why isn't that still commercial in nature? Because it's providing a governmental function. Providing a governmental function, low-income housing, is not a commercial activity. It is a nonprofit entity. Do you agree or disagree with the proposition that was espoused by the plaintiff and by actually one of the amici, and that is that there's a specific treaty right to have housing? Yes, I do agree. And the Treaty of the Blackfoot, 1855, was negotiated by Governor Stevens. And in the concurrence by Judge Fragerson, he notes the line of cases in which the language in the treaty does not say specifically housing, but it has been interpreted to provide the accoutrements of civilization, which does indicate and has meant and has been held to be housing. So it's a treaty-based right for the folks in the Blackfeet tribe to have housing that was guaranteed, that was bargained for in 1855 in the treaty between the Blackfeet Nation and the United States of America. It's a treaty-based obligation. Providing housing is a governmental function. And when you provide housing as a governmental function, I think it's important under the cases in this circuit that you look at the nature of the activity. That's where you decide is there immunity or is there not immunity. And in Gila River, on pretty horrific fact, this court held that the nature of providing law enforcement was indeed a governmental activity. That's important. And I think it's also important to look at the name Kagan case. It's important because in 1974, Circuit Judge Heaney, who was sitting as the trial court judge, looked and decided that tribal entities, tribal corporations, ought to be treated as federal corporations. And he used as a standard that waivers for federal corporations could be fairly inferred or implied. Waivers for tribes have the exact opposite standard. And what happened 24 years later in the Dillon case, the very same Circuit Judge Heaney sitting on that case 24 years later had the advantage of the Santa Clara Pueblo case, which said that waivers had to be unequivocal and clear. And the very same judge, when faced with the same ordinance, came to a different decision. He had the advantage of 24 years of jurisprudence, and he also had the advantage of a clear and unequivocal waiver standard from Santa Clara Pueblo. So I believe Patterson Joe discussed with you the language of Ordinance 7, and I will go to the plain meaning. This version of plain meaning is not a result in a complete waiver if it's adopted. The reference in Article 7, Clause 7 about limiting the waiver to the rents, revenues, and profits, as indicated, has nothing to do with a judgment fund. It has everything to do with an obligation, which under the waiver jurisprudence, looking at this ordinance in the First, Second, and Eighth Circuits, you have to have consent and then an authorization for something else to happen, an obligation, contract, and agreement. I think another significant legal result of the decision is that the application would mean that there would be little or no actionable breaches or actionable lawsuits by tribes for breach of responsibility. On the 2010 cases, the Navajo toll case and the White Mountain Apache case, pervasive control, which this Court found in the opinion, the question seemed to be, what was the corpus? The corpus, indeed, is the Indian houses themselves. That's the corpus of the trust. If there's pervasive control, you have a trust relationship arising out of a treaty obligation, and the corpus itself were the houses. If I understand plaintiff's complaint, their complaint is from the beginning, from the get-go here. Why is it necessary to have a corpus? That's the language, that's the instruction from Mitchell 1 and Mitchell 2. I believe White Mountain Apache and Navajo coal also talked about the trust relationship. You have to have something that you can actually put. You can have a corpus held in the trust, or you can have a land here, but you have this fiduciary relationship. Why is that? I would have straddled the plaintiff's argument that when you have a treaty-based obligation, that that should be enough. I think there are some very important practical impacts of the decision. One is, if HUD's out, there is a question of federal court jurisdiction. If HUD is out of this litigation, there's a question of a lack of an indispensable party. If the trust decision stands, there's potential, if housing remains in, that there would be no cross-claim allowed against HUD. Given the block grant restrictions and the language in the ordinances, there's a real question about whether the money that housing receives from HUD can be used as a judgment fund. Lastly, and perhaps most importantly, in an era where we are attempting desperately to attract new capital to the reservation and build houses in an era of declining block grants because of federal spending priorities going in other directions, causing confusion or letting potential investors, such as Fannie Mae, know that the assets of Blackfeet Housing might be at risk, diminishes the opportunity to build the houses, and it has the unintended consequences of blunting what these folks at Blackfeet Housing have been doing in obtaining national recognition for. One final point. They're finished. The assets, plaintiffs have talked about taxing the block grant fund if they were ever able to obtain a judgment. And when you're trying to convince people to come into the reservation, you have to negotiate. One of the things you have to negotiate is a waiver of sovereign immunity, to some extent a limited waiver of sovereign immunity, so that those people, the bankers, won't feel insecure. And they feel insecure about almost everything. One of the things, one of the last things I would like to do is... Do the bankers loan money on trust plans? Yes, we can. And it's called a purchase money security interest. It's a new device that we're attempting to give them a security. They can't have an interest in the trust plan, but they can have an interest in a mortgage-like document, and they have been willing to loan money on that. Well, but if the land is held in trust by the federal government, they don't have that type of a security interest in the land. No, they don't have a security interest in the land. What is the building? In the instrument that we've created, the purchase money security... What is that? What is it secured by? Well, it's secured by potential future block grants. From HUD. Yes. One last point. Well, housing is obligated to spend the money under a formula. We obtain the money under a formula. We're obligated to spend it. There is very little new housing start in Indian country. But one way to do it is to leverage the money with low-income housing tax credit and to get the involvement of Fannie Mae. One last point. Discussion of remedies was pervasive in the court's opinion. And one thing that a number of courts did do for at least the contract claims of plaintiffs against HUD was to use the savings statute and allow a transfer to the United States Federal Court of Claims. How do you leverage that? Tax credit is where you get this piece of paper from the government and you get some big company to come up with the money. And they're going to get a tax, big taxes, I'm sure. Right? Right. Then they get interest on top of it. Yep. Okay. So where do they get the interest? Rent? The housing competes for low-income housing tax credit. There are a certain number that are given to each state. Right. Okay. The investors get the tax credit, which is secured by future HUD funding and by collecting the rent or money for the leases for the houses that housing is built. They've built 85 of them in the last four or five years. I've taken all of HUD's time. It's secured by the future money that HUD put into the deal. It's secured by housing, collecting from the occupants money, the lease to own monies, and in some instances rental units have been constructed for rent and by future monies coming from HUD. And they've bought it so far. They're a good sale. May I please report? I'm Tim Calvin. I'm an assistant U.S. attorney from Billings, Montana. And I'm appearing on behalf of HUD. My time is very short, but what I'd like to urge the Board in analyzing these breach of trust claims is it's very important to start at the beginning and analyze these claims under the framework that's been established by the United States Supreme Court for trust claims. Under the guidance of the Mitchell decisions and White Mountain Apache and Navajo Nation, we need three things to establish a breach of trust claim. We need a waiver of sovereign immunity together with a claim falling within the terms of the waiver. We need a source of substantive law which establishes specific fiduciary duties the government is required to perform for Native Americans. It requires that the statute be fairly interpreted as mandating compensation for breach of the duties imposed. So the first step in the analysis, don't jump all the way ahead into control and what type of resource this is, whether it's a federal resource, government resource. The first step in the analysis is to actually identify the source of law that the plaintiff is relying on. Well, they are relying at least in part on the original treaty as creating a right to obtain housing from the federal government. Is that a proposition with which you disagree? Yes, I certainly do, Your Honor. And to begin with, I would note that their claim, at least the claim that they filed in district court, is not based upon any treaty-based obligation. The first mention I have heard of any treaty-based obligation was from Judge Fragerson's especially concurring opinion. But, you know, lawsuits, they grow, they change, they develop their living organisms. And this one is. Well, let's assume that it was pleaded. I understand that you're not giving up the argument that it's a brand-new theory that they can't rely on because it wasn't part of the claim. But if it were in the case, what would the result be? Your Honor, I've looked at the treaty that's referred to, especially the concurring opinion, and I cannot find a treaty-based obligation, a specific fiduciary obligation on the part of the government to build houses for Native Americans. The actual provision of the treaty referred to provides that the United States agrees to expend annually for the benefit of the Plattevue Nation, some not exceeding $15,000 annually for 10 years, in establishing and instructing them in agricultural, mechanical pursuits and educating their children and, in any other respect, promoting their civilization and Christianization. That is far removed from any type of provision that creates specific fiduciary duties the government is required to perform, particularly after the expiration of the 15-year period stated in the treaty. I certainly do disagree that it has the fiduciary duty created in that treaty, which the American government is required to perform. My only indication is that it would tell us that, in the background language, that it's a duty to take care of the Indians, to see that they have proper shelter, education, and all of that. Your Honor, I know... I sat down to negotiate the treaty for a long time. It started out, you know, with Stephen. He's often the great white father to me, which makes me realize how important you are to me. We are here to help you. And all those folks around me believe in you. We're all getting started. And so we actually told these folks, and I sat down, and that created an opportunity. You get them to move off the land, you take their land. You tell them you're going to take good care of them. Your Honor, it may create a moral obligation, but the question here is whether or not there's a legal obligation, whether or not there's a legal duty. Can we tell those folks that we've got a moral obligation, a legal obligation? What do you think they believe? Your Honor, I can't answer that, but the fact of the matter is, is there is no viable claim here. There is no viable claim in federal district court for the remedy to the plaintiff's problems. If we take... I don't think HUD understood to provide the funding for these people to have homes. Right. And HUD specified the period. HUD specified the design. HUD specified the foundation. That's right. Well, that is... They made it all up for us. No, that is... Did HUD come around and inspect these while they were going up? I'm not certain, Your Honor. They had to. They had to. They always do it, don't they? They're putting out federal money. They've got to see where it goes. Sure. There's no question, Your Honor, that HUD... Why isn't HUD involved? Well, Your Honor, I guess the question is, what is it for me to control HUD? These folks in the tribal council, are they developers? Are they builders? Are they contractors? I don't know, Your Honor. I don't know either. It's good that these regulations did provide HUD the authority to not only fund it, but also provide technical assistance. How are these foundations constructed? I don't know, Your Honor. I've never seen a building constructed. Sure, you have. Usually, you don't have them. For a concrete foundation, you've got to put blocks and things. You put this normalized wood on top, and then you get them all around the perimeter, and then you put your floor around the perimeter, and then the ground around the perimeter. Was it done that way? Or did they just put boards? They put stuff on the boards right here. Your Honor, I don't know. This is your foundation. I don't know how the holes were constructed. But HUD did not dictate, and didn't have authority to dictate what materials were used in the holes. The holes merely had to comply with the minimum standards of materials used. I think they had to have a solicitor's agreement. Well, Your Honor, I guess that's a factual issue that they've alleged in their complaint in the posthumous case, now being in a motion to dismiss. We have access to that. Sure. But back to your original question of whether or not, I guess, because there is some obligation on the government and under these treaties to provide and to civilize the Indian people, whether or not there is an obligation at the field homes, et cetera. Your Honor, all the cases that they talked about earlier, the vast majority of them are general trust cases. There's no question, Your Honor, as you pointed out in your opinion, that the United States has a general trust obligation to Native Americans. But the Supreme Court has specifically stated that that general trust obligation is not sufficient to create a fiduciary trust relationship giving rise to a cause of action for creating trust. But the fiduciary can be given. Excuse me? The fiduciary can be given. Perhaps. But if that's the case, how efficient is that? But you need to go beyond that. Of course, there is an undeniable trust relationship between the government and the Native American people, but you have to go beyond that in order to establish a claim. You have to establish specific fiduciary duties beyond that the government is required to perform on their behalf. In this case, none of the statutes relied upon, none of the enactments relied upon by Marceau creates that. Thank you. I had a case a long, long time ago, and I'm trying to find it. This is important. About some government agencies, it appears that they had control of money, usually to make orphaned children, and they put that money in the bank. It's embarrassing. For years and years and years, the last time one said that they had a fiduciary obligation, they said that there was a fair return on that money. And that's precisely the type of claim that would be apprised to a fiduciary trust claim. In that situation, the federal government is taking control of property and resources belonging to American Indians. And here's where your argument is, I understand it is, that there never was any control over tribal resources of any kind. Basically, you gave money, and if the tribe wanted money, they could take it on the condition that they meet the minimum regulatory requirements, and that's your position. Correct. We're not regulating federal and tribal property and resources. We use the federal resources. We use the federal resources. And if, for example, if we were to create a rule that said, any time the government gives money to Indian tribes and regulates how that money is spent, that they create a fiduciary enforceable trust claim, that any time we give money to the Indian tribes for education, for health care, for commercial enterprises, for government, for law enforcement, for any of the myriad of reasons that we give. Well, we do do that. The schools that we give, you know, the BIA, that's the school that we go to. And we give that to the federal government. We follow up on these reservations and all that. Exactly. And then there are fees. Exactly. So, if we created a rule that said, any time that you give money in those forms to tribes and regulate how that money is spent, you're creating a trust asset and you're creating a liability for breach of a trust claim, that that's far removed from what these cases are talking about. I see that I'm well past my time, if the Court has any additional questions. We like to talk. And I'd like to answer any questions that you have, Your Honor. Your Honor, as I started my argument, I think that it is an easy process. I think that if you analyze the claims as they should be analyzed, and as part of the beginning, and try to identify what is the source of the harm. What you're saying is that all that's left is to go to the tribal council. Everybody. No. Oh. Sorry. When I go deaf, he says I can sue him. I think that's what he just said. Well, that's a federal court claim. I forgot my train of thought. But there is that general fiduciary obligation. There is. Well, I was going to say here, when it came to these chemically treated nations, they were inquiring. Something that I came up with. I came up with that we've got to do it this way. Again, Your Honor, in the complaint, the plaintiff's double-edged that this is on wood-treated foundations. And we have to accept that, although it is not pertinent to the resolution of the complaint. No, Your Honor, I respectfully disagree. Those issues are not pertinent to whether or not they have a viable claim. You can accept that as true. But you have to go back and, again, identify what the source of law they're relying on. They say that I've had a duty to do this. I've had a duty to build houses. I've had a duty to repair houses. What is the source of that duty? It's nonexistent. And unless they can find a statute that has those types of duties, those types of fiduciary duties in the statute, that also waives sovereign immunity, they don't have a claim. Excuse me, Your Honor. It doesn't have cases that tell us that the government has that sort of claim, that treaty language such as requisites to promote civilization has language that proves to be helpful to provide housing. The federal government has long found that it's a good thing that American Indians try to provide housing. They have language that's worthwhile. Your Honor, I'm not aware of that, to be honest with you. I understand that that's their position. Again, if we're to impose trust responsibilities on the government, that they're enforceable by claims of breach of trust or failure to provide housing to Native Americans, failure to educate the Native Americans, or failure to provide health care or anything else that could be grouped under this umbrella of civilizing them, I think they're expanding this claim far beyond anything that was envisioned by the court in Mitchell 2 and Lighthouse, New Hampshire. Is the General Allotment Act involved? Well, it's not involved in the claim as far as how they put it. They haven't based any of their claims on the General Allotment Act. Probably the reason for that is that to one, the United States Supreme Court found that the General Allotment Act did not give rise to it. Here's something here. It goes, when tribal land is taken from us under the General Allotment Act, it is done to ensure that every Indian should have a, quote, homestead of his own with the assistance provided by the federal government to build houses and tents and open farms. And there's a site there, 18th Harvard Blackletter Law Journal, which we can use for quoting the Commissioner of Indian Affairs. Annual report, 1885. Henry Dodd, the proponent of the General Allotment Act, stated that housing was a central element of the act. The government took the land in trust, and it committed itself to play a major role in housing that cuts land in question. This is Harvard Blackletter. And that may be his interpretation of the General Allotment Act, but again, it's not. That's Henry Dodd. But I do know if their claim is based on the General Allotment Act. If the panel doesn't have any further questions, thank you very much. Thank you. I'm Jeff Stankovic. I represent the plaintiffs' appellants. Thank you very much for allowing me the honor of addressing this court, and I'll be brief. The Blackfeet Housing Authority was a tribal corporate entity. It no longer is. Now it's called Blackfeet Housing. At the time when the Blackfeet Housing Authority was created, it was never intended historically to have sovereign immunity. When it was created, the sue and be sued clause expressly stood for a waiver of sovereignty. And when the 153 homes at the Glacier Suffrage were built at the Browning Reservation, the Blackfeet Housing Authority had before and then waived its sovereign immunity. They changed their name, and then they took out anything about sovereign immunity, but they did not deny. They do not deny. Was it just a change of name, or are there other changes? Sorry, Judge Graber. It was a reorganization, but basically they took over the exact same duties as they had before. So there's no question that we have a proper party in front of us? Yes, Your Honor, because they agreed to assume all of the previous entity's rights and obligations, and that's not denied. Now there's a clear distinction between sovereign and corporate actions of the tribe, and it comes from the Indian Reorganization Act of 1937, where it's specified in Section 16, the authority of the tribes to adopt constitutions for internal government, and in Section 17, authorizes the tribes to adopt charters of incorporation for entities that engage in commercial enterprise. So is this a Section 17 or a Section 16? Your Honor, in my opinion, it was a Section 17. Well, the claim on the other side is that there are procedures that must be followed in order for something to be legitimately a Section 17 entity, and that those things did not happen. Why isn't that a factual dispute that has to be resolved by the district court? We can't take evidence and develop a record on what was done and all of that. Why is that something that we can decide on this record? I can certainly agree with you, Judge, but I believe at the same time that the court needed to be aware of the fact that there's a simple distinction between sovereign activities of the tribe and corporate activities of the tribe. Right, and they're saying these are sovereign activities because they never formed a Section 17 entity. I believe that they did. I do agree it's a question of fact for the lower court to determine, but my understanding is that the Blackfeet Housing Authority agreed to incorporate an entity of the housing authority as a Section 17 entity, and, Your Honors, it's not necessary to overturn the more recent decisions of the court in order to promote any doctrine of self-determination. We are in an era of self-determination right now, and I've been up to ground, and I've spent nights in those homes and incidentally judged many of them are poor foundations with two-by-fours and plywood around, all wood in the basement, not stacked, but in a more conventional design, but the plywood and the two-by-fours sticking out are pressure-commuted wood. Many of the houses that I saw do have that. I've been there two dozen times in the last five years. I have to clear that up. Now, it's illegal fiction to claim sovereign immunity for corporate entities because it devalues Indian self-determination, because corporate entities are created under tribal powers of self-government, and then they can't be held accountable for their actions. It's repugnant. It's repugnant. It's morally repugnant for an entity to have the right to sue but not be sued in return, and that's why Blackfeet Housing Authority, now called Blackfeet Housing, then had the right to sue or be sued. It was specifically incorporated into it. And, Your Honors, I would just like to... Where are they going to get the money? They got it from HUD because the only way they can... An opinion of the Secretary of the Interior in 1940 stated that incorporation was necessary for tribes to receive loans or grants from the federal housing schemes. It also said in part that a tribe which has not been incorporated cannot be said to have authority to enter into the undertakings probably required for engaging in low-rent and slum clearance projects, particularly the authority to sue and be sued. And as an administrative matter, it is doubtful a tribe not so incorporated under Section 1750 granted federal funds. It was always intended, Your Honors, respectfully, that tribal housing authorities, like any other corporate entity, be capable of suing and being sued. Thank you. One second. You look a little like Jim Brown. You guys look just like Judge Brown. Just wanted to say very quickly, number one, I think you've proved and shown everything that Jim Taven was asking about. We've shown a waiver under 1404A of the Housing Authority. We've shown a source. And, yes, I would like to incorporate the treaty. Jim, I think you've got a valid point. The source that we are focusing on, the Housing Act, to that clause stated they are mandatory, not predatory. And, number three, we have a compensation in that community. I think we've met everything there. I think it's just totally unrealistic to say, Oh, all we did was provide the money. We made the contract. Just as I indicated in the case I referred to, you can't hide behind a contract. That's what the government is doing here. Thank you. Thank you. It was a good spirit. I've argued about this afternoon. I appreciate it. And I still love it. Thank you. Thank you. Thank you.
judges: Pregerson, Graber, Gould